USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/15/2023_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LATONIA JONES, individually and on behalf
of her minor child, D.J.,

                                  Plaintiff,

          -against-

COUNTY OF WESTCHESTER, ROSA HAZOURY,
ELKE KNUDSEN, and LISA COLIN, ESQ.,

                                  Defendants.

No. 14-cv-7635 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

 Plaintiff, Latonia Jones ("Jones" or "Plaintiff"), individually and on behalf of her child

D.J., who was a minor at all relevant times and at the start of this action, asserts claims against the

County of Westchester (the "County"), and Rosa Hazoury and Elke Knudsen, both Senior Case

Managers at the Westchester County's Department of Social Services (together with the County,

the "Defendants"), arising out of D.J.'s removal from the custody of her biological mother, Jones.

Following the Court's Order and Opinion dated March 31, 2021 (ECF No. 197, the "March 31,

2021 Order and Opinion"), Plaintiff's three remaining causes of action are her: (1) substantive due

process violation for denial of education under 42 U.S.C. § 1983 and the 14th Amendment due

process clause against the individual Defendants; (2) a Title II ADA claim against the County for

failing to provide an education; and (3) a state law negligence claim against the Defendants for

failing to provide an education. (*See* March 31, 2021 Order and Opinion; *see also* ECF No. 198

(Third Amended Complaint or "TAC").  Plaintiff seeks monetary damages for violations on her

remaining claims.  (TAC at 53–54.)

Before the Court is Defendants' motion for summary judgment to dismiss all of Plaintiff's remaining claims. For the reasons discussed below, the Court GRANTS Defendants' motion for summary judgment.

## BACKGROUND

The facts below are taken from the parties' Rule 56.1 statements,[1] affidavits, declarations, and exhibits, and are not in dispute except where so noted. All rational inferences are drawn in Plaintiff's favor.

### I. Factual Background

D.J. was born on October 7, 1999. (ECF No. 247 ("Pl.'s 56.1 Counterstatement") ¶ 1.) On May 18, 2005, D.J. was removed from her mother's care and placed into the care of the Westchester County Department of Social Service ("DSS").

Around the time that D.J. was placed into DSS custody, she had been diagnosed with reactive Attachment Disorder. (Pl.'s 56.1 Counterstatement ¶ 83). By around April 2007, D.J. had been diagnosed with Bipolar I Disorder, Severe Psychotic Features, and was receiving medications. (*Id.* ¶ 155.) Later that year, D.J. was diagnosed with Mood Disorder NOS, psychotic Disorder NOS and Oppositional Defiant Disorder, and was receiving medications. (*Id.* ¶ 167.)

Defendants Hazoury and Knudsen are Senior Case Managers employed by the County and responsible for DJ's care. (TAC ¶¶ 11–12.)

---

[1]     The Court notes that Plaintiff's 56.1 Counterstatement is 92 pages, which violates the Court's Individual Rule 3(G)(ii), requiring that Rule 56.1 statement be limited to no more than 25 pages. *See* Hon. Nelson S. Román Individual Practices Rule 3(G)(ii). Plaintiff never asked for or was granted leave to file a 56.1 counterstatement that exceeded the page limitation requirements. The Court also notes that much of the content in Plaintiff's 56.1 Counterstatement pertains to facts relevant to claims that are no longer at issue and that have already been dismissed (*i.e.* claims related to Plaintiff's placement and medical treatments). Therefore, the Court only considers facts raised in Plaintiff's 56.1 Counterstatement to the extent that they are relevant to the instant motion.

### A.  D.J. 's Placements

Below, the Court outlines D.J.'s placements from May 2005 to August 13, 2018, when she was discharged from the care and custody of DSS (ECF No. 242 ("Defs.' 56.1") ¶ 34.):

| | |
|---|---|
| May 19, 2005 | D.J. was placed with foster mother RM.  (Defs.' 56.1 ¶ 1.) |
| May 20, 2005 | D.J.  was transferred to foster mother AC.  (*Id.* ¶ 2.) |
| August 2, 2005 | D.J. was admitted to Andrus Diagnostic Center. (*Id.* ¶ 4.) |
| November 21, 2005 | D.J. was transferred from Andrus Diagnostic Center to foster home of HH. (*Id.* ¶ 5.) |
| January 20, 2006 | D.J. was admitted to Four Winds Hospital. (*Id.* ¶ 6.) |
| February 22, 2006 | D.J. was discharged from Four Winds Hospital back to HH. (*Id.* ¶ 7.) |
| September 24, 2007 | D.J. was admitted to Four Winds Hospital. (*Id.* ¶ 8.) |
| November 26, 2007 | D.J. was discharged to Astor Home for Children.  (*Id.* ¶ 9.) |
| April 3, 2008 | D.J. was admitted to Four Winds Hospital.  (*Id.* ¶ 10.) |
| May 22, 2008 | D.J. was discharged to Astor Home for Children.  (*Id.* ¶ 11.) |
| June 26, 2008 | D.J. was admitted to Four Winds Hospital.  (*Id.* ¶ 12.) |
| August 10, 2008 | D.J. was discharged to Astor Home for Children.  (*Id.* ¶ 13.) |
| October 15, 2008 | D.J. was transferred to Stony Lodge Hospital.  (*Id.* ¶ 14.) |
| September 4, 2009 | D.J. was transferred to the therapeutic foster home of P.C. through the North American Family Institute.  (*Id.* ¶ 15.) |
| October 13, 2009 | D.J. was admitted to the Westchester Medical Center. (*Id.* ¶ 16.) |
| April 28, 2010 | D.J. was admitted to Four Winds Hospital.  (*Id.* ¶ 17.) |
| November 8, 2010 | D.J. was discharged to the Rockland Children's Psychiatric Center.  (*Id.* ¶ 18.) |
| June 6, 2012 | D.J. was transferred to her mother on a trial discharge to parent.  (*Id.* ¶ 19.) |
| June 26, 2012 | D.J. was transferred to Rockland Children's Psychiatric Center.  (*Id.* ¶ 20.) |
| August 15, 2012 | D.J. was transferred to her mother on a trial discharge to parent. (*Id.* ¶ 21.) |

| September 3, 2012 | D.J. was admitted to Westchester Medical Center.  (*Id.* ¶ 22.) |
|---|---|
| September 19, 2012 | D.J. was transferred to Rockland Children's Psychiatric Center. (*Id.* ¶ 23.) |
| November 28, 2012 | D.J. was transferred to Parsons Child & Family Center. (*Id.* ¶ 24.) |
| January 18, 2013 | D.J. was discharged from DSS's care and custody. (*Id.* ¶ 25.) |
| October 10, 2014 | D.J. was removed from her mother's care and custody and returned to the care and custody of DSS.  (*Id.* ¶ 26.) At this point, she was already admitted to Westchester Medical Center.  (*Id.* ¶ 27.) |
| November 14, 2014 | D.J. was discharged to Parsons Child & Family Center.  (*Id.* ¶ 28.) |
| September 10, 2015 | D.J. was admitted to Pinefield Psychiatric Hospital. (*Id.* ¶ 29.) |
| March 23, 2016 | D.J. was discharged to Easter Seal.  (*Id.* ¶ 30.) D.J. remained at Easter Seals until she turned eighteen years old. (*Id.* ¶ 30.) |
| October 6, 2017 | D.J. was transferred to Abbott House OMR Group Home. (*Id.* ¶ 31) <br><br> Subsequent to her eighteenth birthday, D.J. was appointed an Article 81 guardian and was placed by the New York State Office for People with Developmental Disabilities. (*Id.* ¶ 33) |
| August 13, 2018 | D.J. was discharged from the care and custody of DSS.  (*Id.* ¶ 34.) |

In total, D.J. was in the care and custody of DSS from May 19, 2005 through January 18, 2013, and then again from October 10, 2014 through August 13, 2018.  (*Id.* ¶ 35.) During that time, D.J. resided in a foster home from May 19, 2005 through August 2, 2005, from November 21, 2005 through January 20, 2006, from February 22, 2006 through September 24, 2007, and September 4, 2009 through October 13, 2009—approximately two years and two months total. D.J. resided with her mother on trial discharge from June 5, 2012 through June 25, 2012 and from August 15, 2012 through September 3, 2012 (*id.* ¶ 36.), and again was in her mother's custody from January 18, 2013 to October 10, 2014.  (*Id.* ¶ 46; *see also id.* ¶¶ 19–22, 24–25.)  At all other times, D.J. was placed in either a hospital, residential treatment facility ("RTF"), or residential treatment center ("RTC") (collectively, "Non-Foster Placements").  (*Id.*)

**B.  D.J. 's School Enrollment**

The parties dispute over whether DSS had responsibility at all times that it had custody over D.J. to ensure that D.J. was receiving an education suitable under New York State Education Law.  (*See* Defs.' 56.1 ¶ 37; ECF No. 246 ("Pl.'s Response to Defs.' 56.1"), ¶ 37.)  Defendants argue that during the times that D.J. was in a Non-Foster Placement, the facility at which she was housed was required to provide her educational services under Article 81 of the New York State Education Law. (Defs.' 56.1 ¶ 37.)

The below tracks D.J. 's enrollment in school or educational programs:

*2005-2006 Academic Year*.  D.J. was enrolled at Andrus Diagnostic Center, and then at Liberty School, until she was admitted to Four Winds Hospital on January 20, 2006.  (Defs.' 56.1 ¶ 38.)  On February 22, 2006, D.J. was returned to H.H. and attended the BOCES Liberty St. School until it was reported that she was "expelled" from the school on March 16, 2006.  (*Id*.)  An emergency Committee on Special Education ("CSE") meeting was held on March 23, 2006. A decision was made to provide D.J. with home tutoring while applying to Green Chimneys and Clearview schools. The home tutoring would be provided by the Monroe-Woodbury School District.  (*Id*.)

*2006-2007 Academic Year.*  D.J. attended Clearview School.  (*Id*. ¶ 39.)  Plaintiff remarks that this was the only year in which D.J. was fully enrolled in a school.  (Pl.'s response to Defs.' 56.1, ¶ 39.)

*2007-2008 Academic Year*.  D.J. attended Clearview from July 2007 until she was admitted to Four Winds Hospital on September 24, 2007. (Defs.' 56.1 ¶ 40.) D.J. remained enrolled at Clearview through November 30, 2007, after which she had been discharged to Astor Home for Children. For the remainder of the academic year, D.J. was either in Four Winds Hospital or Astor

Home for Children, which Defendants argue were charged with providing appropriate academic services to D.J. (*Id.*)

    ***2008-2009 Academic Year***.  D.J. was in either Four Winds Hospital or Astor Home for Children until she was transferred to Stony Lodge Hospital.  (Defs.' 56.1 ¶ 41.)  On December 10, 2008, Stony Lodge held a CSE meeting to discuss D.J.'s education plan while at Stony Lodge. (*Id.*)  Plaintiff alleges that D.J. received random, isolated "tutoring" sessions with no progress, but was not enrolled in school.  (Pl.'s Response to Defs.' 56.1, ¶ 41.)

    ***2009-2010 Academic Year***.  At the beginning of the school year, D.J. was located at the P.C. foster home, which was located in the Bronx. (Defs.' 56.1 ¶ 42.)  Within a week of being placed with P.C., D.J. was evaluated by the New York City CSE. (*Id.*)  On September 23, 2009, a meeting was held with the CSE to discuss D.J.'s individualized education plan ("IEP"). (*Id.*)  While D.J. did not attend school before her admission to the Westchester Medical Center on October 13, 2009, she was enrolled with the New York City Department of Education, which had completed the IEP process. (*Id.*)  After her admission to the Westchester Medical Center, D.J. was in either Westchester Medical Center or Four Winds hospital.  (*Id.*)  Defendant argue that these institutions were charged with providing appropriate academic services to D.J. (*Id.*)  Plaintiff alleges that D.J.'s foster mother at the time repeatedly asked to enroll D.J. in school; the Defendants failed to do so. (Pl.'s Response to Defs.' 56.1, ¶ 42.)

    ***2010-2011 Academic Year***.  D.J. was either in Four Winds Hospital or Rockland Children's Psychiatric Center, which is run by the New York State Office of Mental Health and provided education service to D.J. while having her enrolled through the Peekskill School District. (Defs.' 56.1 ¶ 43.)

***2011-2012 Academic Year***.  D.J. was at Rockland Children's Psychiatric Center until she was sent to her mother on June 5, 2012 on a trial discharge.  (Defs.' 56.1 ¶ 44.)   During her time at Rockland Children's Psychiatric Center, D.J. was enrolled in the Peekskill School District.  (*Id*.) At the beginning of the trial discharge, a meeting with the Peekskill CSE was scheduled for June 8, 2012. Tutoring services were offered in the interim, but Jones declined those services.  (*Id*.)

***2012-2013 Academic Year***.  On September 3, 2012, D.J. was admitted to Westchester Medical Center. (*Id*. ¶ 45.)  From that point forward, D.J. was in Non-Foster Placements— Westchester Medical Center, Rockland Children's Psychiatric Center, and Parsons Child & Family Center. (*Id*.)  Defendants argue that each of the non-foster placements was charged with providing appropriate academic services to D.J.  (*Id*.)

***2013-2014 Academic Year***.  On January18, 2013, D.J. was released from the custody and control of DSS to live with her mother and was not returned to DSS custody until October 10, 2014.  (*Id*. ¶¶ 46; 25–26.)  Pursuant to an order issued by the Family Court of the State of New York, County of Westchester, D.J. was discharged to the custody of her mother.  (ECF No. 241, ("Adin Decl."), Exh. B.)

***2014-2015 Academic Year***.  On October 10, 2014, when D.J. re-entered DSS custody, she was admitted to Westchester Medical Center, and thereafter was transferred to Parsons Child & Family Center.  (Defs.' 56.1 ¶ 47.) Defendants argue that these non-foster placements were responsible for providing appropriate academic services to D.J.  (*Id*.)

***2015-2016 Academic Year***.  D.J. was located in Parsons Child & Family Center or Pinefield Psychiatric Hospital, until she moved to Easter Seals on April 23, 2016.  (*Id*. ¶ 48.) Defendants argue that these non-foster placements were responsible for providing appropriate academic services to D.J.  (*Id*.)

*2016-2017 Academic Year*.  D.J. was located at Easter Seals for the entire year, which Defendants argue was responsible for providing appropriate academic services to D.J. (*Id*. ¶ 49.) She was enrolled with the Peekskill School District, with an out-of-district placement at the Robert B. Jolicoeur School. (*Id*.) The Jolicoeur School is the school located at Easter Seals.  (*Id*.)

*2017-2018 Academic Year*.  Until D.J. turned 18 years old in October 2017, she was at Easter Seals, which Defendants argue was responsible for providing appropriate academic services to D.J. (*Id*. ¶ 50.)  During that time, she was enrolled with the Peekskill School District with an out-of-district placement at the Jolicoeur School. (*Id*.)   After turning 18, D.J. was transferred to Abbott House OMR Group Home, which was responsible for providing appropriate academic services to D.J.

## II. Procedural Background

Plaintiff commenced this action on September 19, 2014, and filed a First Amended Complaint on October 20, 2014. (ECF Nos. 1, 4.) Following an Initial Pretrial Conference on November 19, 2014, Plaintiff was granted leave to file a Second Amended Complaint ("SAC"), while Defendants were granted leave to file Rule 12(b) and 12(c) motions.  In the interim, the case proceeded to discovery before Magistrate Judge Judith C. McCarthy.  (ECF No. 18.)

Plaintiff filed the SAC on January 15, 2015 and again on January 27, 2015 due to a filing error. (ECF Nos. 23 & 26.)  The SAC, which covered events that occurred between 2005 and 2014, contained a total of 28 pages and 142 paragraphs, excluding subparagraphs.  (ECF No. 23.) Thereafter, on April 3, 2015, Defendants filed their respective motions to dismiss and motion for judgment on the pleadings. (ECF Nos. 34 & 38.)  Meanwhile, discovery continued.

On December 14, 2015, this Court issued its Opinion and Order on Defendants' various motions.  (ECF No. 121.) The Court stayed resolution of Defendants' challenges to Plaintiff's

substantive due process and state-law claims pursuant to the *Younger* abstention doctrine, in light

pending proceedings before the Westchester County Family Court. (*Id.* at 10.)  The Court also

granted Defendants' motion to dismiss Plaintiff's civil RICO claim. (*Id.* at 13.)  Two weeks later,

on December 28, 2015, Plaintiff moved for reconsideration of the December 14, 2015 decision.

(ECF No. 125.)  Thereafter, on January 15, 2016, Plaintiff filed a notice of interlocutory appeal of

the December 14, 2015 decision (ECF No. 132), which the Second Circuit stayed pending the

resolution of the motion for reconsideration (*see* ECF No. 136). By Opinion and Order dated

March 8, 2016, the Court denied Plaintiff's motion for reconsideration (ECF No. 135), and the

Second Circuit lifted the stay of the appeal (ECF No. 136).  The Court then stayed discovery in

the case pending the resolution of the appeal.  (ECF No. 124.)

On February 7, 2017, the Second Circuit issued a summary order vacating the Court's

December 14, 2015 decision and remanding the case for furthering proceedings. (ECF No. 139.)

The Second Circuit concluded that *Younger* abstention did not apply to cases involving efforts

only to obtain monetary damages. (*Id.* at 3.)  The Court lifted the stay and directed the parties to

complete an amended discovery plan and appear before Magistrate Judge McCarthy.  (ECF No.

143.)

On March 3, 2017, Defendants requested that the Court reopen the previously pending

motions. (ECF No. 150.)  The Court held a conference on March 22, 2017 during which Plaintiff

requested and was granted leave to file a motion to amend the complaint.

On September 5, 2017, Plaintiff filed a motion to amend the SAC.  (ECF No. 169.)  The

proposed Third Amended Complaint (ECF No. 169-2) ballooned from 28 pages and 142

paragraphs to a staggering 181 pages and 711 paragraphs and included numerous references to,

and quotations from, unattached documents, as well as redundant, argumentative, and conclusory

statements.  On January 27, 2020, the Court issue an opinion and order denying Plaintiff's motion to amend for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. (ECF No. 182.) The Court permitted Plaintiffs to seek leave to file a revised Third Amended Complaint consistent with that order.

On June 26, 2020, Plaintiff filed a motion for leave to file a new proposed Third Amended Complaint (ECF No. 187)), which was shortened to 54 pages and 368 paragraphs. The revised proposed complaint contained twelve causes of action: (1) violation of DJ's Fourteenth Amendment due process rights against all defendants, (2) an unclear *Monell* claim against the County of Westchester, (3) violation of DJ's rights under the ADA against all defendants, (4) violation of DJ's Article XVII New York State Constitutional rights against all defendants, (5) violation of DJ's rights conferred by the Social Services Law and Family Court articles Six and Ten against all defendants, (6) negligence against the County of Westchester, (7) negligent supervision against the County of Westchester, (8) failure to train against the County of Westchester, (9) negligence against Defendants Knudsen and Hazoury, (10) intentional and negligent infliction of emotional distress against all defendants, (11) legal malpractice against Lisa Colin, and (12) loss of consortium against all defendants.  (*See* ECF No. 187.)

On March 31, 2021, the Court issued an Order and Opinion denying Defendant's motion to dismiss as to D.J.'s substantive due process claim for failure to provide an education against the Defendants Rosa Hazoury and Elke Knudsen, D.J.'s ADA claim for failure to provide an education against the County, and D.J.'s negligence claim for injuries arising from failure to provide an education against the County, Rosa Hazoury, and Elke Knudsen.  (March 31, 2021 Order and Opinion at 26.)  The Court dismissed all other claims, including those raised against D.J.'s former family court counsel.  (*Id*.)

10

On April 1, 2021, Plaintiff filed her proposed Third Amended Complaint, which the Court finds to be the operative complaint (the "TAC") as modified by the Court's March 31, 2021 Order and Opinion, which dismissed several of the claims raised.  (ECF Nos. 197 and 198.)  Defendants filed an answer to the TAC on May 5, 2021.  (ECF No. 199.)  Discovery proceeded before Magistrate Judge Judith C. McCarthy.  The Court held a conference on February 25, 2022 at the conclusion of discovery and issued a briefing schedule on Defendants' anticipated motion for summary judgment to dismiss all remaining claims.  (*See* Minute Entry Feb. 25, 2022.)

The instant motion for summary judgment was fully briefed as of September 23, 2022. (ECF No.239.)

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star*

*Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation") (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

## DISCUSSION

## I.  Substantive Due Process Claim

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "Substantive Due Process" prevents the government from engaging in conduct that "shocks the

conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights "[i]mplicit in the concept of ordered liberty," *Palko v. State of Connecticut*, 302 U.S. 319, 324 (1937). "Two requirements must be satisfied in order for a state actor to be held liable for failing to protect a child in its custody.  First, the alleged acts and omissions must have been a substantial factor leading to the denial of the constitutional right . . . . Second, the officials in charge of the agency being sued must have displayed a mental state of deliberate indifference." *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 194 (E.D.N.Y. 2014) (internal quotations omitted).  "'[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.' Ordinary negligence by itself cannot constitute deliberate indifference, but 'gross negligent conduct creates a strong presumption of deliberate indifference.'"  *S. W.*, 46 F. Supp. 3d at 196 (citing *Doe v. New York City Dep't of Social Services*, 649 F.2d 134, 142 (2d Cir. 1981) ("repeated acts of negligence could be evidence of indifference").

Defendants seek dismissal of Plaintiff's substantive due process claim on the basis that (i) a claim for denial of education is not a cognizable, as access to public education is not a constitutional right; (ii) Defendants are entitled to qualified immunity, because a substantive due process right to education is not clearly established; and (iii) that either way, the record demonstrates that D.J. was enrolled in school and/or placed into facilities that were responsible for providing her education.  (*See* ECF No. 244 ("Defs.' Mem.") at 3–9.)

While the Court admonishes Defendants to the extent that DSS failed to assure that D.J. was receiving an adequate education, the Court agrees with Defendants that Plaintiff cannot assert a substantive due process claim on D.J.'s behalf based on a right to education.  It has been well established that "[t]he right to public education is not fundamental [and] accordingly, there is no

13

substantive due process right to public education." *Marino v. City Univ. of New York*, 18 F. Supp.

3d 320, 339 (E.D.N.Y. 2014) (citing *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 217–18

(2d Cir.2012)) (cleaned up); *Richards v. City of New York*, 433 F. Supp. 2d 404, 422–23 (S.D.N.Y.

2006) ("Although it is disgraceful that ACS and LFCS did not ensure children in their custody

were properly and promptly enrolled in school, '[t]he Fourteenth Amendment does not protect a

public education as a substantive fundamental right.'") (citing *Handberry v. Thompson*, 436 F.3d

52, 70 (2d Cir. 2006)); *see also San Antonio Indep., Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.

Ct. 1278, 36 L.Ed.2d 16 (1973) ("Education, of course, is not among the rights afforded explicit

protection under our Federal Constitution."); *Plyler v. Doe*, 457 U.S. 202, 221, 102 S. Ct. 2382,

72 L.Ed.2d 786 (1982) ("Public education is not a 'right' granted to individuals by the

Constitution."); *see also Phillips v. City of New York*, 775 F.3d 538, 543 n.5 (2d Cir. 2015) (New

York law requiring vaccination in order to return to school does not violate substantive due process

because "there is no substantive due process right to public education.") (citing *Bryant*, 692 F.3d

at 217).

Because D.J. may not prevail on her substantive due process claim, summary judgment is

GRANTED as to Plaintiff's substantive due process claim for D.J.'s right to education.[2]

---

[2]         Plaintiff argues that Defendants are barred from challenging her education substantive due process claim under the law of the case doctrine based on the Court's March 31, 2021 ruling that her proposed TAC adequately pled a substantive due process claim for right to an education.  (*See* Pl.'s Opp. at 4; March 31, 2021 Order and Opinion at 19, 26.)  The Court notes that at the time that the Court issued the decision, neither of the parties had raised the issue of whether a claim based on a violation of a substantive due process right to education was legally cognizable, and instead, the parties disputed whether there were any adequately alleged constitutional claims in the proposed TAC. (*See* ECF Nos. 174, 176, 190, 192.)

        Because the Court finds that it is well-established that there is no substantive due process right to education, the Court now dismisses Plaintiff's claim.  *See supra*; *see also Sykes v. New York State Off. of Child. & Fam. Servs.*, No. 1:18-CV-8309-GHW, 2019 WL 4688608, at *11 (S.D.N.Y. Sept. 25, 2019) ("As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended.") (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)(cleaned up); *see id.* ("Indeed, it is axiomatic that the doctrine of judicial self-restraint requires courts to exercise the utmost care when presented with a request to define or develop rights in this area.") (citing *Local 342, Long Island Pub. Serv. Employees v. Town Bd*., 31 F.3d 1191, 1196 (2d Cir. 1994) (internal quotations omitted).

Accordingly, the Court need not assess whether Defendants are entitled to qualified immunity.

## II.  Plaintiff's ADA Claim

Defendant Westchester County seeks to dismiss Plaintiff's surviving ADA claim, which is based on her allegations that D.J. was denied the benefits of and full participation in the state education system.  To establish a *prima facie* case of discrimination under Title II of the ADA, a plaintiff must demonstrate that "(1) [she] is a qualified individual with a disability; (2) the defendant is subject to [the ADA]; and (3) [s]he was denied the opportunity to participate in benefit from the defendant[s'] services, programs, or activities, or was otherwise discriminated against by the defendant[s] because of [her] disability."  *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196–97 (2d Cir. 2014); *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). "Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016).

Based on her arguments in opposition, Plaintiff appears to be pursuing an ADA claim under a reasonable accommodation theory, and not under a disparate treatment and disparate impact theory. (*See* ECF No. 246 ("Pl.'s Opp.") at 16.) "The ADA seeks to prevent not only intentional discrimination against people with disabilities, but also discrimination that results from 'thoughtlessness and indifference,' or, in other words, from 'benign neglect.'" *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 522 (S.D.N.Y. 2020) (citing *Alexander v. Choate*, 469 U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); 42 U.S.C. § 12112(b)(5)(A) (defining discrimination to include failing to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability").  Reasonable accommodation under the ADA requires "affirmative accommodations to ensure that facially neutral rules do not in practice

discriminate against individuals with disabilities." *See Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 597 (S.D.N.Y. 2013) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 271 (2d Cir.2003)). Notably, however, "where an individual challenges 'the substance of the services provided'—rather than 'illegal discrimination'—there is no ADA violation. *Tardif v. City of New York*, 991 F.3d 394, 405–06 (2d Cir. 2021) (citing *Doe v. Pfrommer*, 148 F.3d 73, 84 (2d Cir. 1998)).

The parties only contest the third element of the ADA claim—that D.J. was denied an opportunity to participate in educational services because of her disability. The undisputed facts show that D.J. resided in a foster home from May 19, 2005 through August 2, 2005, from November 21, 2005 through January 20, 2006, from February 22, 2006 through September 24, 2007, and September 4, 2009 through October 13, 2009—approximately two years and two months total. (Defs.' 56.1 ¶ 36.) D.J. resided with her biological mother from June 6, 2012 to June 26, 2012, August 15, 2012 to September 3, 2012, and January 18, 2013 to October 10, 2014. (*See* 56.1 ¶¶ 19–22, 24–25.) The rest of the time until she was discharged from DSS's custody on August 13, 2018, D.J. was institutionalized at a Non-Foster Placement. Plaintiff does not challenge educational services that D.J. received from September 2006 to June 2007, when D.J. attended Clearview (*see* Pl.'s Opp. at 6), nor does she dispute educational services D.J. received when she resided with her biological mother. Plaintiff challenges D.J.'s receipt of educational services as to all other years. Specifically, Plaintiff argues that D.J. was not enrolled in school at all during the 2008–2009; 2009–2010; and 2010–2011 school years. (*See* Pl.'s Opp. at 6–7 (citing Pl.'s 56.1 Counterstatement ¶¶ 184–212)). For the other years, Plaintiff argues that the educational services provided to D.J. were "not suitable under New York State Education Law." (Pl.'s Opp. at 6–7.)

For purposes of ADA liability, the Court agrees with Defendants that D.J. must have been

denied a service *of the County*. *Council of the Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 234 n. 8 (S.D.N.Y. 2020) ("the proper inquiry under the ADA . . . is whether the [disabled] have been denied meaningful access to a specific service of the [Defendant]"); *Woods v. Tompkins Cnty.*, 804 F. App'x 94, 96 (2d Cir. 2020) (County was not liable under Title II of the ADA for the discontinuation of her aide services provided by private entity). The parties do not contest, as is obvious, that DSS does not directly provide educational services to children in its custody. However, the parties disagree regarding what "service" DSS was responsible for providing to D.J. with respect to her educational needs.

The County argues that DSS was only responsible for facilitating D.J.'s enrollment in school, and not for the actual provision of educational services. (*See* Defs.' Mem. at 10.) The County avers that the school districts and the Non-Foster Placements are the entities responsible for providing educational services under applicable social services laws and regulations. (*Id.* at 11.) Plaintiff, on the other hand, argues that "since D.J. was in the County's custody for the duration of her school-age years, it had a duty under the ADA to ensure she was receiving a proper education." (Pl.'s Opp. at 17.)

Importantly, the Court reminds Plaintiff that, as stated in the March 31, 2021 Order and Opinion, the question here is whether there is an ADA violation arising from D.J.'s purported denial of access to education altogether while in DSS's custody. The question is *not* whether D.J. was denied a free appropriate public education, which is a claim that would have been subjected to Individuals with Disability Education Act ("IDEA") exhaustion requirements. (*See* March 21, 2021 Order and Opinion at 17 ("Here, DJ challenges the County Defendants' failure to enroll her in any education program whatsoever, not their failure to provide her with appropriate services and instruction. Accordingly, IDEA exhaustion was not required.") (citing *Fry v. Napoleon Cmty.*

*Sch.*, 137 S. Ct. 743, 755 (2017)).  Nor is a claim of "suitability" of educational services provided cognizable under Title II of the ADA.  *See Tardif*, 991 F.3d at 405–06.

In order to assess whether DSS denied a "service" to D.J. regarding her educational needs, the Court looks to applicable state laws and regulations.  In doing so, the Court finds it agrees with the County that Plaintiff fails to point to evidence showing that the County denied a service to D.J. with respect to her education.

First, while D.J. was in a Non-Foster Placement, the Non-Foster Placement was responsible under applicable state laws and regulations for ensuring that D.J. was enrolled and received an appropriate education, and the responsibility was not on DSS.  *See* 18 N.Y.C.R.R. § 441.13(a) (Child care agencies "shall take such steps as may be necessary to make certain that all children in care receive education appropriate to their needs and in accordance with the requirements of the Education Law."); *see, e.g.*, *Bd. of Educ. of Garrison Union Free Sch. Dist. v. Greek Archdiocese Inst. of St. Basil*, 18 N.Y.3d 355, 359, 962 N.E.2d 247 (2012) ("St. Basil submitted an application for a certificate to operate a residential care program for children pursuant to Social Services Law § 460-b. The regulations required St. Basil to submit an educational plan showing that it would take the necessary steps to ensure that the children living at the institution receive an education in accordance with the requirements of the Education Law.") (citing 18 N.Y.C.R.R. § 441.13(a)); *see also N.Y. Educ. Law* § 4002(3) ("each child care institution maintaining a school shall appoint a committee on special education of the same composition as required of public schools . . . . Such committee shall have responsibility for evaluating each pupil suspected of having a handicapping condition who has been placed in the care of a child care institution by a public agency and each child placed in a residential treatment facility for children and youth, and placing such children in an appropriate special education program . . . ."); 8 N.Y.C.R.R. § 200.11(a) ("Students residing in

18

hospitals of the Office of Mental Health (OMH) and schools of the Office for People with Developmental Disabilities (OPWDD) shall be identified, evaluated and provided with special education and related services in accordance with the provisions of section 116.6 of this Chapter . . . (1) The committee appointed in each facility pursuant to section 116.6(a) shall recommend to the school district in which the facility is located that those students determined by the facility committee to be able to benefit from instruction in a public school program be admitted to the schools of such district.").

Therefore, the County Defendant is not liable under the ADA for the Non-Foster Placements' purported failure to enroll D.J. in school, or their purported failure in providing D.J. with an adequate education. Plaintiff does not cite to, nor does the Court identify, any case law where social services departments could be held liable under the ADA for failing to ensure that a third-party facility provides educational services. [3]

Second, with respect to foster placement, the applicable laws and regulations indicate that while social services departments are required to assist in designating a school district and coordinating enrollment in school for children in their custody, the educational services that are provided are the school district's responsibilities. *See* N.Y. Educ. Law § 3244(2)(a) ("Notwithstanding any other provision of law to the contrary, the social services district, in consultation with the appropriate local educational agency or agencies, shall designate either the school district of origin or the school district of residence within which the child in foster care shall be entitled to attend"); *see* NY. Educ. Law § 3244(2)(d) ("Upon notification of the designation made by the social services district for a foster care youth, the designated school district of

---

[3] This is not to say that DSS and/or the County should not be held responsible under N.Y. state law for failing to supervise or monitor whether D.J. was properly enrolled in school and receiving an adequate education. The Court's finding here is limited to liability under Title II of the ADA.

attendance shall immediately: (1) enroll the child or youth in foster care even if the child or youth is unable to produce records normally a requirement for enrollment, such as previous academic records, records of immunization and/or other required health records, proof of residency or other documentation and/or even if the child has missed application or enrollment deadlines during any period of placement in foster care, if applicable."); *see also* N.Y. Educ. Law § 4402(2)(a) ("The board of education or trustees of each school district shall be required to furnish suitable educational opportunities for students with disabilities by one of the special services or programs listed in subdivision two of section forty-four hundred one of this article.").

Plaintiff argues that the County Defendant violated the ADA because the County Defendant did not enroll D.J. in school between September 4, 2009 through October 13, 2009, when she was placed in P.C.'s foster home.  (*See* Pl.'s Opp. at 7.)  However, according to the record, while D.J. was not attending school at the beginning of the 2009–2010 school year, she was enrolled with the New York City Department of Education, which was evaluating her Individualized Education Program to consider appropriate school placement.  (*See* Adin Decl., Exh. H; Hazoury Aff. ¶ 51.)  Therefore, Plaintiff's ADA claim against the County Defendant with respect to failure to enroll D.J. in school while she was in foster care fails.

Nor can Plaintiff succeed on her ADA claim based on failure to provide D.J. adequate educational services during her time in foster care, as that is the responsibility of the school district. *See supra*.  In addition, as noted above, a claim challenging the substance of services provided is not actionable under the ADA.  *See Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 501 (D.N.J. 2000) ("Moreover, if, in order 'to participate fully' in the foster care system, Plaintiffs are challenging 'the substance of services provided,' this is not actionable under the ADA or RHA.") (citing *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir.1999) (noting that appellees' challenge

to "the substance of the services provided" is not actionable under the ADA, as compared to "illegal discrimination against the disabled").

For the aforementioned reasons, the Court finds that Plaintiff fails to satisfy her burden of establishing liability against the County for violation of Title II of the ADA.  Therefore, the Court GRANTS summary judgment against Plaintiff's Title II of the ADA claim.

## III.  Plaintiff's Negligence Claim

Considering this Court's decision to grant summary judgment in Defendants' favor on Plaintiff's federal claims, it does not assess the merits of Plaintiff's negligence claim and declines to exercise supplemental jurisdiction over it.  *See Schaefer v. Town of Victor*, 457 F.3d 188, 210 (2d Cir. 2006); *Rocco v. N.Y.S. Teamsters Conference Pension and Ret. Fund*, 281 F.3d 62, 72 (2d Cir. 2002); *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 402 (S.D.N.Y. 2011); *Sefovic v. Mem. Sloan Kettering Cancer Cntr.*, No. 15-CV-5792 (PAC), 2017 WL 3668845, at *8 (S.D.N.Y. Aug. 23, 2017) (court can dismiss state law claims where "it has dismissed all claims over which it has original jurisdiction").  Such claim is therefore dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. Plaintiff's Third Amended Complaint is dismissed with prejudice, except for the state law claim which Plaintiff is free to assert in state court to the extent a cognizable claim exists.

The Clerk of the Court is directed to terminate the motion at ECF No. 239. The Clerk of the Court is also directed to terminate the case and all Defendants, and to enter judgment in favor of the Defendants.

Dated: September 15, 2023

      White Plains, NY

SO ORDERED:

HON. NELSON S. ROMAN
UNITED STATES DISTRICT JUDGE